The third case on our docket this morning is 21-20547 Versaggi v. KLS Martin, L.P. Mr. Veponian Thank you, Your Honor, and may it please the Court. I don't normally make extracurricular comments before an argument, but I just want to say what a pleasure it is to be in front of law students in the law school. So I thank the Court for traveling and making that happen. Your Honors, my client here, Lauren Versaggi, was harassed for 11 months by phone and social media and in other ways. It was a nightmare for her. And inexplicably, the person doing the harassment was the girlfriend of one of her colleagues, Royal Smith. Despite that, her employer, KLS Martin, did not make the relatively modest accommodations that she asked for in response to the anxiety disorder she suffered because of that year-long nightmare. For that reason, we think the summary judgment should be reversed, and I'm going to focus in particular on the ADA retaliation claim and the failure to accommodate claim. So let me start with failure to accommodate. The only basis the District Court gave for granting summary judgment on that point was that Ms. Versaggi had not told KLS Martin of her disability. But as a matter of summary judgment, again, is there a disputed issue of material fact? That's the only question. That just isn't true. And the best evidence I would point you to is at Record 778, that is the declaration of Sherry Johnson, who is KLS Martin's own HR manager. And she says, I was aware of Ms. Versaggi's requests for protection and accommodation, and I was aware that Ms. Versaggi had an emotional condition. And that statement, though it's not prolix, is backed up by numerous documents in the Record. What was the timing? Was that in 16, or was that not until 18? No, Your Honor. She is only the HR manager in 2016 and 17. So 16 or 17 is when she was aware. So she's before the formal diagnosis comes in from Ms. Versaggi's doctor. So this is exactly the time where the district judge says there's no evidence that Ms. Versaggi. Accommodation for emotional? It's anxiety disorder, but that's an ADA disability, so long as it affects major life activities, as we all know. And here there's clear evidence in the Record that it affects her major life activities. There's a letter from Ms. Versaggi, for example, saying that she can't sleep. So that's directly on point. Again, I know they want to make other arguments at trial, and that's fine. We certainly look forward to litigating this case on the merits. But the question is, as a matter of summary judgment, did KLS Martin know that Ms. Versaggi had an emotional disorder and was asking for accommodation? The answer to that is yes, and at the very least, there's a disputed issue of material fact on that point. And so from our perspective, that's all Judge Hittner said. And so if that's wrong, then we think you ought to reverse and remand for further effect development in the trial court. Is there anything else? I mean, you say that you probably don't need anything else than the HR person saying she requested accommodation. No, Your Honor. There is other evidence that backs up what Ms. Johnson says. So there's a letter from Ms. Versaggi to KLS Martin where she says, you know, I can't sleep, I'm having anxiety, so on and so forth. And there are the internal notes from Ms. Johnson herself that say, I'm aware that Ms. Versaggi is having these anxiety situations and that she's asking for accommodation. Is there any link between the idea of don't publish my whereabouts being related to my anxiety? Is there anything that links so that people would know that those particular things are accommodations rather than just professional requests? Your Honor, I think she uses the word accommodation with respect to that request. I don't know that I can cite a page to the record where she says, because of my ADA disability, I'm requesting this because it will reduce my anxiety. I don't think I have that. But it gets pretty close in the record, especially in her letters to KLS Martin. And so I think just as a matter of summary judgment, is that enough for a jury to conclude that that's what she was asking for? I think so. Now, my friends on the other side are likely going to say that this court should affirm for alternative grounds on the failure to accommodate claim. I don't think the court should get there. Of course, this court has discretion to affirm for alternative grounds, and it does so sometimes. But most of the time, I think the court should ask the district judge to take a look at the case and take the district judge's views into consideration as part of its review. And here there are particular reasons why I think that makes sense. One is there's some complication with respect to their alternative grounds. So one of their arguments is this timeliness issue with respect to when the EEOC charge is filed after the first incident. And there there's some facts that I think the district judge could sketch out. For example, how many times does Ms. Versaghi ask for accommodation? When are those dates? Which of them might be in or out of any proper EEOC charge? So that's one thumb on the scale, in my view, towards saying, well, no, let's just send this back, and we can deal with that in the future if it comes up. Another thing. I'm sorry. No, no. Go ahead. I'm trying to understand and make sure I get the rule of law that you're asking us to both announce and apply. What relevance is there in this case to the fact that Royal Smith is both an employee of KLS and also the boyfriend of the aggravator? Does it matter? Do you need a workplace connection? Or if she had sent this, I'm looking at the e-mail she sent on November 24th, 2016, and obviously this is terrible, and it's horrible what happened to her, but I'm not sure I understand if it matters if she had just said, you know, I'm unable to sleep. I've been genuinely frightened for my safety because I was, you know, robbed at gunpoint on the way home. Does it matter that Royal Smith, a KLS employee, is involved? Or would the same thing apply if there was a death in the family, violence outside the workplace, something that would cause the same anxiety and symptoms? From the perspective of the disability, I don't think it matters. From the perspective of the accommodation we're asking for, I think it matters. Because the accommodation Ms. Versaghi asked for is, look, make sure I'm completely isolated from Royal Smith. And also I need to be comfortable that I'm not going to be pursued by someone else because at the time this all was going on, the criminal investigation with respect to Mr. Smith was not completed. It was only completed after this case was filed in 2019. And Ms. Versaghi at the time does not know who else is involved. And, you know, it could be someone else in the company as well. So if it's not, if it doesn't really matter that it was Mr. Smith, his involvement, that sounds like it's a matter of law, it's not the thing that makes this an NADA case in your view, how is the employer supposed to know the distinction between, hey, listen, I'm really struggling with some terrible stuff going on in my life, death in the family, got stuck up on the way to my car at night, that kind of thing, versus I'm claiming a disability under the ADA. You are obligated as a matter of law to accommodate me. I'm not sure I understand where, how would you announce the legal rule? Well, I think obviously, like, the best version is to announce, look, I have an ADA disability, here's the doctor's, you know, diagnosis and so on. That's the ideal. But that is not what the law requires. And I think the case that's relevant here is, I hope I'm not butchering it, but I think it's EEOC v. Chevron. It's cited in our opening brief. But what the court says there when talking about how clear the plaintiff has to be about the accommodation, look, plain English is enough, you don't have to be a doctor, you have to at least put enough into the record to make, you know, a company think, okay, well, I'm probably dealing with the ADA here. And here, again, we're dealing with a big company that has an HR manager. When someone is coming in and saying, look, I'm having trouble sleeping, I'm having all these problems with my major life functions, and it's because of this thing, and I'm asking for accommodations, I think that's exactly what would normally trigger a corporation to go, okay, that's probably an ADA thing, let's ask. You know, that's one option they have. They can say, look, give us some evidence of that and we'll give you the accommodation. Or if they don't like the accommodation, which I know my friends on the other side don't, they can say, well, we can't do that, but here's an alternative. Because what the ADA says is, you know, there should be some sort of iterative process with respect to this. But none of that is a matter of law, at least with this kind of record. I think with this kind of record, there's enough in here that Mr. Versaghi is entitled to develop that further. Do we have to establish some new theory, like the Seventh Circuit says, about being a crime victim as a particular category? Is that necessary for disposition of this case? No, Your Honor, you don't have to say that. Of course, it makes the facts more extraordinary from our perspective that Mr. Versaghi was the victim of a felony and was abused in this way for so long. But no, you don't have to say that. I think you just apply the normal standards for ADA failure to accommodate. And, you know, if Mr. Versaghi had not said, I'm having these problems with my life and I need an accommodation, that's a different case. And do we have a fair number of cases that say that you don't need the doctor's thing in 18, that that's not required? Yes, Your Honor. What's the best published case for that? I think the best published case is this EEOC v. Chevron. EEOC v. Chevron. Yeah, I think that's the best case. Again, I'm not sure that it's – in that case, I don't think you necessarily say you don't need a doctor's note. But I think what you say is the defendant needs to know what's going on. And that, I think, is something – again, if they want to say there's no way we would have understood what Mr. Versaghi is saying, to the jury, that's fine. We welcome that litigation. But this is just a question of summary judgment. If I could briefly touch on the other alternative ground for affirmance they raise with respect to failure to accommodate. They do say that the accommodations Mr. Versaghi asked for are sort of unreasonable as a matter of law. I don't see how that could be so. Again, that's a defense they can raise. They also have undue hardship as a defense that you can raise under the ADA. I expect them to do that if this case is remanded, and that's fine. What about they did accommodate her? What about straight up they accommodated her, and so it should go away? So that's why I'm not pressing the argument about this national sales meeting, which is another one of these accommodations that Mr. Versaghi asked for. She didn't want to go to a conference with Mr. Smith. And they did accommodate that. And so I think from that perspective, I'm not pressing that. So you're only pressing the whereabouts? Yes. So there's a weekly email where it says where she is and what she's doing. And it goes to the entire sales team. And Mr. Versaghi asked that that not happen because of the situation. It sort of increased her anxiety. And then the second thing is there's these weekly teleconference calls where Royal Smith's on it. And Mr. Versaghi asked that she be excused from those or he be excused from those, and that didn't happen. Now, they say factually that those are not required teleconferences. Again, we can have our arguments about that. We have a declaration from Paul Reynolds that says that they are required. But she says it too. She also says it. That's right. So it's just a disputed issue of fact. And, you know, they may be right. We may be right. But, you know, that's just not something for somebody to. So is it your position that nobody at the company should be able to know her whereabouts? Oh, no, of course not, Your Honor. Monty Gardner, who is her supervisor, that's perfectly fine. There's no reason to believe Mr. Gardner was involved in any of this. And she was willing to tell Mr. Gardner where she was. They say she wasn't, but I don't see that in the record. What I understand from the record is she doesn't want her colleagues to see where she is. And that makes perfect sense to me is for someone in this situation. If I could briefly address retaliation since, you know, I'm in the last two minutes. Again, the only basis for the district court's decision there was a pleading failure. So it's effectively a 12B6 dismissal. But if you look at this petition, and it's a state court petition. Now, I know under Smallwood we have to treat it as if it's a federal petition, a federal complaint. But it is a state court petition. And it mentions retaliation, and it sets forth the facts that support Ms. Versaghi's claims on that point. And so I think the district court was just wrong in denying, in granting, essentially, a 12B6 dismissal. But even if there was a problem with the pleading because the retaliation claim was not broken out, which is the problem I think the district court identified. In that scenario, I think you have to give leave to amend before dismissing with prejudice. And even if that was wrong, let's say Ms. Versaghi had filed a petition that doesn't say anything about retaliation at all. As I say in our brief, there are numerous cases from this court that say in that scenario, if you raise a completely new cause of action in your opposition to summary judgment, you have to assume that that amends the complaint. It's sort of a manifestation of Rule 15A. And so, you know, one thing I might say if I was on the other side is, oh, well, there's unfair prejudice in that scenario. Because how would we have known? But if you look at Ms. Versaghi's EEOC charge, all of those causes of action are set forth in there in some detail. Again, it's not as crisp as you eventually get to, but that's the nature of an EEOC charge. Is your hostile work environment your weakest? Yes, Your Honor. It certainly is the weakest. It's a little weaker than constructive discharge, which is in turn a little weaker than these other two that I'm focusing on. But, you know, I would basically stand on my briefs with respect to those. And I think I don't necessarily need them if I can get these first two that we're talking about. Counsel, again, I want to affirm that I understand what happened to your client is terrible, so I don't want this question to be misunderstood. I understand, Your Honor. But I'm, again, just trying to understand how far this rule goes. If an employee sends to the HR manager an e-mail and says, I'm depressed, I'm having trouble eating, I'm having trouble sleeping, I'm going to go see a doctor next week and see if I can get some medicine for my depression, is that an invocation? Oh, and by the way, I need you to accommodate my depression. That's the e-mail. Does that trigger the protections of the ADA? Yes, I think as a threshold matter. But I think the employer can't, because all you have to do is put the ADA into play in your initial statement. Because that puts a lot of employees into the ADA's world that I wasn't, before this case, I wasn't expecting. I don't know that it does, because I think you have to say that there is an ADA disability, and you need accommodation, and you're saying it to the employer. I don't know that that's a lot of things. But also, I think the employer has a perfect right to come back and say, well, that's fine. Why don't you give us some more, you know, proof of that or evidence or give us a doctor's note? That's all part of the ADA. We're not saying that you just make wild claims and then the company has to do whatever they want. I see my time is up now. Ms. Mack? May it please the Court. My name is Emily Mack. I am counsel for KLS Martin L.P. With me today is the general counsel for KLS, Mr. Greg Lunney. I want to first address, understanding that we're focusing on the ADA failure to accommodate claim and the cause of action for retaliation under the Americans with Disabilities Act, that Ms. Versaghi was fully accommodated by KLS at the time that this concern was brought to KLS's attention. That first happened in November of 2016. She requested that there be no direct contact with Mr. Smith. KLS spoke with Mr. Smith about this. He denied any involvement, and to this day it's very bizarre that no one's really been able to determine how Ms. Mendoza got her phone number, and that's not the subject of this proceeding. But it is something that everyone asks me about. Does the record say whether they're still? They are not. And Mr. Smith was deposed. As soon as he found out about this, which was through KLS, he broke up with her, and they have not spoken. And it's also not disputed that Ms. Versaghi herself had no direct contact with Mr. Smith after asking that she not have any direct contact with him. So that was fully accommodated. Mr. Smith was prevented from attending a sales meeting in 2016. Mr. There was also a regional sales meeting in December that was canceled, and he was prohibited from attending a national sales meeting in 2017. So it was over a year later, after this all came to surface, that Ms. Versaghi and Mr. Smith still had no direct contact at any point. What about the weekly e-mail and the teleconference calls? Sure. Because that's where they say that she wasn't. You said she's been completely accommodated, and he says no. There's these two areas where she wasn't. Right. With respect to the weekly e-mails, Mr. Smith was not on those. She doesn't dispute that Mr. Smith was not copied on those e-mails. But we don't know who had access that was feeding this to the other person. Right. So that's why couldn't it be limited to her boss? Right. All she was asked to do, and, in fact, not required. If she didn't do it, she wasn't disciplined or anything, but she was asked to disclose what city she would be in with the other sales representatives who were on her team so that they could coordinate potentially sales activities. If I'm going to be in Austin during this week and you're going to be there, there may be a common client that you would want, again, to perform your duties, to be able to know that someone else, so that multiple sales reps aren't hitting up the same hospitals or clients at the same time. And so, again, there was no indication that anyone else at KLS was involved here. And, you know, that was reasonable. Right. Well, that's kind of why isn't that a fact issue? The idea that you're not accommodating her request because you're saying it's not reasonable because it's reasonable for her to tell her team where she is. And so it's a choice that her request is too much. And you're totally allowed to do that as an employer and say, no, we can do this, but not that. Right. But isn't there a fact issue on whether this was a reasonable request? So you can't say you accommodated her because you didn't. I mean, or at least there's a fact issue. Respectfully, Judge Elrod, I think this gets back to your earlier point about there being the lack of a causal link between the accommodation, I'm frightened for my safety, which is what we were hearing in these requests where she's saying, I don't want to have to share my whereabouts, you know, to include cities. And there not being any knowledge of KLS Martin having knowledge of her having a qualifying disability under the ADA at this point. And I want to point this court, I think, to the patent versus Jacobson Engineering Group decision, which is a Fifth Circuit decision from 2017. And in that case, which is very, I think, factually similar in terms of someone who had, well, in fact, I think the facts here are stronger than what we have here. But the court emphasized that where a disability, resulting limitations, and necessary reasonable accommodations are not open, obvious, and apparent to the employer, the initial burden rests primarily on the employee to specifically identify the disability, resulting limitations, and to suggest a reasonable accommodation. This court in that case also said that in the case of a mental disability, which is what she's alleging here, anxiety. Well, I feel like you kind of have pivoted. You've pivoted to saying she didn't allege a disability timely. That's a different point than whether or not she was accommodated. Is that your point? Are you arguing both? Yes, Your Honor. She was accommodated. Well, but she, there's a fact issue on that, isn't there? Your Honor, I don't think there is a fact element on that because a plaintiff is not entitled to their preferred accommodation. They are entitled to a reasonable accommodation. Right, but so you have to negotiate and say, no, we're not going to do that, but we'll do this instead. Right, and again, Ms. Versaghi in this case never, you know, that was not a request that was made to HR as a formal request for an accommodation. In fact, that didn't occur until January of 2018. This was an email that she sent to her supervisor, Monty Gardner, in December of 2016, and she said, you know, I'm not comfortable sharing my location because of, you know, what has recently occurred to me with this Cynthia Mendoza, and he responded to it and says, Royal Smith's not on the emails. You know, you're only being asked to disclose them to the people that are on your team, and that's the end. She never escalated that to HR. She never escalated that to anyone above. Had there been some, you know, escalation from her perspective on that, then certainly, you know, Calis would have accommodated it. You know, the one thing that some of the notes from Sherry Johnson early on and the response from Monty Gardner show that Calis took this very seriously. We want her to feel comfortable. We prohibited him from attending a national sales meeting. We allowed her to skip meetings when she wasn't comfortable with it. But at some point, you know, there was no indication that anyone else, you know, and I think had she escalated that, it would have been addressed. Yeah, because was there communication between Johnson and Gardner? Because the opposing counsel's position or your friend on the other side's position is that once Johnson knew about it, then certainly they would talk to the supervisor and say, Look, she's requested accommodations, and legally we have to do X, Y, Z. Right. Again, I think what we have to do is put this in the context of how this originally came to the company's attention, which was when this request for no contact with Smith happened. And it was, I have been a victim of this cyber stalking. Until the criminal investigation against him is resolved, I don't want to be around him, and I don't want to have contact with him. And the company said, Okay. These two employees didn't work together. So there really wasn't, you know, any reason for them to have to work together. But if she's now saying, I'm not even comfortable sharing my location with other employees, that's a separate request and would need to come, I think, back for a discussion if that was something she was still uncomfortable with. What about the teleconferences? The teleconferences, we have a declaration in the record from Rich McLaughlin, who was, you know, that's the best evidence in the record that I can point to of what those actually were. And it was they were, number one, they were recorded. So if you didn't want to participate live, you could listen to it later on. It was a weekly call or a monthly call for the, I'm sorry, it was a monthly call. Is that a fact issue of whether or not you had to participate? She says, I had to participate, and you're saying you're Rich McLaughlin, is that? Says you don't have to participate. Why isn't there a fact issue then? There wasn't a fact issue because, again, she never, her claim is that she was, quote, forced to participate in these sales calls. They were not, it was a one-way method of communication for the product sales manager to say what was happening in terms of product developments. People called in. They listened. If they wanted to ask questions, they could ask questions. There was no crosstalk between any sales reps on these weekly calls. Smith was never speaking directly to Ms. Versaghi on any of these calls. She doesn't allege that he was. Instead, what she alleges is just merely having to hear his voice, which it is undisputed in the record that the individual who was directing them, Mr. McLaughlin, again, did not, or it might be McClanahan, but he doesn't recall that Mr. Smith ever asked any questions on any of these calls. So, again, it's like saying I don't want to have to walk past an office and overhear a co-worker speak. So, no, I think as a matter of law, Your Honor, that would not be a reasonable accommodation to say that I don't want to have to hear my co-worker's voice. Okay. It seems like you were first saying that it wasn't mandatory, and now you're saying it's not a reasonable accommodation. I guess you're saying kind of both. But why isn't there a fact issue on whether it was required, mandatory or not? I'm saying there's not a disputed issue of material fact. You're saying it's not material or it's not genuine? All of those. It's not genuine and it's also not material here. And it's as a matter of law would be an unreasonable accommodation. Again, so similarly, Ms. Versagi never specifically came to KLS and asked to be excused from this sales call. That's a whole other argument. Okay. There's many grounds on which this court can affirm the district court's opinion here. This is problematic for many reasons. Ms. Versagi also does not contend, again, that she was disqualified from working generally, and so her sole kind of thrust of her argument here is that she didn't want to have to work around Mr. Smith. And I think KLS accommodated the request that she asked for and probably did more than what would have been required under the circumstances. I want to make sure that I get to the retaliation claim. Counsel, before we move on to this one, I just want to focus for just a minute on what the district court actually decided, right, and not the failure to accommodate, but the fact that prior to January of 2018, KLS was not on notice of the disability. So I'm looking at the email that Ms. Versagi sent to Ms. Johnson on November 21, 2016, and I see here that she says, I've lost my appetite, can't sleep, obviously major life activities. I'm having this debilitating anxiety from this horrible situation. She talks about the KLS Martin employee, Royal Smith. She talks about the law enforcement thing. And she specifically says, I love my job and would like to continue to do my job, but I need to request an accommodation in regards to working with Mr. Smith. Now, I get it. We can talk about the accommodations and whether you actually did the accommodations. But I don't understand how that's not putting KLS on notice. I mean, she even uses the word accommodation. And at the beginning of the sentence, I love my job and would like to continue working here, that's exactly the sort of thing that we see in ADA cases, right? I like this. I want to do this. But I need an accommodation to continue doing this. That's ADA speak, isn't it? Your Honor, I don't think in the context of this case that it is. I think that had she said, you know, again, the accommodations and the language that is used with respect to the accommodation doesn't come with something like modified work schedule, work from home, leave of absence, struggling to perform essential functions of my job. It comes with respect to I'm afraid for my safety and want to be kept away from this individual. I think when you take the e-mail in context and in the context of the meetings that occurred and the days that followed and what she was specifically asking for, that takes this out of the ADA world and really puts it in terms of more just general safety, concerns for personal safety, which are important and which the company, I think, did everything it could to accommodate, right? But it doesn't translate this into an ADA disability accommodation case. But it goes on. In many ways, I think the next paragraph is the one that's the most compelling because she says, look, you told me on the phone that an e-mail's enough, but, quote, I would like to fill out any appropriate paperwork to file a formal document detailing this. I'm going to schedule a meeting with HR. I mean, she's trying to avail herself of HR remedies, right? Well, the HR, there are notes in the record from the meeting that occurred the day after, and I think what you will see in those notes is that her concern was personal safety and being kept away from Royal Smith and wanting until, you know, this criminal investigation into the harasser was completed, not I'm not able to meet job obligations. And that's, I think, what is the important crux of this. She at all times has said she was a stellar employee, and none of this interfered with her work performance in any way. And so, you know, when you're an HR professional and someone is saying that's kind of the crux of it, is I have this disability, and it's that causal link, again, between the disability and your inability to perform your job functions without a reasonable accommodation. She was not asserting that she couldn't perform job functions without an accommodation. And that's what's different about this scenario from, you know, an ADA case and a true failure to accommodate case. If you can't sleep and you're having an anxiety disorder, that is going to interfere with your job unless you can get some sort of accommodation. Ms. Versaghi has never contended that this interfered with her job performance in any way, and it's not in the record. She has never asserted that this has interfered with her ability to perform her job. That the fear of having to hear his voice would hurt her ability to do her job. Even though she can't sleep and she's got anxiety disorder. Well, she wasn't diagnosed with anxiety disorder until 2018, and I would say that generalized references to stress, to anxiety, even to lack of sleep, you know, again, an impairment in and of itself is not a disability. It has to substantially interfere with the activities, and then there need to be limitations therefrom that result in the need for an accommodation. Lack of sleep is an impairment, right? It's an impairment, but not necessarily a disability. It's an impairment, right. Well, it requires, it has the issue because it interferes with the job function because you can't have the normal meetings that would have everybody's voice on the phone, regardless of whether they're directly speaking to each other or they're speaking to the supervisor only. That is the normal job. That's the normal job duties as a salesperson, to be on the phone with your sales manager getting the hoopla. This is what we're going to do, and this is how we're going to win and get more sales this quarter than last quarter. You know, and these are our contacts that we need to follow up on. So, Judge, in your example, I think had Ms. Versaghi came to KLS and said, you know, these calls, I just can't do them. It's really stressing me out and exacerbating my anxiety disorder to have to participate in them. Is there another way that I can get this information? KLS would have accommodated that. She never came and said anything about the fact it wasn't until this litigation was filed that she contended that these sales calls that she was participating in were something that, you know, she didn't want to be doing. The interactive process contemplates a good faith dialogue between the employer and the employee. It's a two-way street. So her saying, I don't want direct contact with Mr. Smith, the company made sure that happened. This wasn't direct contact. It was indirect contact. And if it was something that was bothering her, then she had an obligation to come to KLS and to tell them that it was bothering her, and that is not in the record. So the report to her supervisor was inadequate. That was about the weekly e-mail, which, again, he was not copied on the e-mail. So I think, again, if that was something very similarly, if that was something that she said, you know what, really sending out these e-mails is exacerbating or causing, you know, it's interfering with my job performance. I am so stressed out when I wake up every morning because I have said that I'm in Austin and I don't know. Then it would have been addressed. But that didn't happen. We have one e-mail where she says, I don't want to share this because of my personal safety. And he says, well, Mr. Smith isn't on it. And that was where it stopped. So, again, she had open lines of communication with HR, with others, in addition to her supervisor, and certainly could have, you know, raised that issue. Is this a separate supervisor than the supervisor who said, get over it. You need to move on with life. I mean, isn't that what the record shows, that some supervisor said, get over it. You need to move on. Is this the same supervisor or a different one? Your Honor, that happened a year later, and I can look at it, but I can't tell you. You don't know if it's the same Ms. Monti? I don't know that it was Mr. Gardner. I actually think it might have been Kevin Bass. That's who it was. It was the CFO of the company. Am I allowed to finish? That was in the context of them trying to gauge her comfort level about whether or not a year later the two of them could be at the same sales conference, and they would keep them separate because it was very important for them. The company felt that it was important for them both to attend, and that's the context in which she alleges that those comments were made. Ultimately, she was excused from that conference. So, no, it was not the same supervisor is my recollection. Thank you. Thank you, Your Honors. A few brief points. One, I just want to bring this back to what the district court held as Judge Oldham observed. All we have with respect to failure to accommodate is the district court saying KLS Martin did not know about the disability at all. Nothing to do with the scope of the accommodations, what kind of accommodation, who did what. None of that is the basis of the district court's opinion. And so I think you can just read the letter Judge Oldham read, read Ms. Johnson's declaration, read the other notes that we have in the record, and conclude that there's at least a disputed issue of material fact. Number two, my friend on the other side said, you know, Ms. Versagge says she was a stellar employee throughout. I do want to make one observation on that. This is exactly how we want plaintiffs in ADA cases to behave. She's trying to do her job, and she is really good at it. And now all she needs is these small accommodations, relatively modest accommodations, to help her anxiety. And that's what they denied. The fact that they granted her other accommodations, I understand that. But that's something that they can argue to a court later or to a jury or wherever we end up with this case. Third, Kalis Martin says again and again, including in their brief, that really Ms. Versagge was upset about her safety, and that's not her anxiety disorder. And so her announcement in that letter, it doesn't give them notice. It is certainly true that Ms. Versagge is also upset about her safety. And so those things intersect. But I think there's no doubt in the record that Ms. Versagge is saying she has a terrible emotional condition and there are these accommodations that can help her. So the fact that she also has safety concerns is just not a problem for us, at least, again, at summary judgment. Finally, and I'll cede back some time, I think, unless the court has questions, there's this dispute of material fact about whether these phone calls are mandatory or not. I understand that their person says they're not. Ms. Versagge and Paul Reynolds say they are. That's, again, something that needs to be sorted out at a trial court. Having said that, unless the court has further questions, I urge you to reverse the judgment law. Thank you, counsel, and we have your argument.